Let's wait a minute and just let everyone get settled. We have plenty of time. Okay, I think that this case needs to start with the statute itself. And I have given the court a handout and that is at tab 1. The Lanham Act Section 1117 expressly says that a plaintiff who establishes liability shall be entitled, subject to equity, to defendant's profits, to any damages sustained by the plaintiff and the costs of action. That's an and that holds those three things together. In Rolex and in American Rice, two of these, this court's cases, this court held that the purpose of Section 1117 is to take all of the economic incentive out of a violation of the Act. In American Rice, this court described the three purposes of Section 1117 or an award of profits under that section. It is to compensate the harmed plaintiff, to remedy the unjust enrichment of the infringer, and to deter future infringement. We are here today because the district court employed incorrect legal standards in determining whether profits should be awarded in this case. The court made two general legal errors that I would like to discuss today. These are involving two of the factors that were set forth in this court's Pebble Beach case where it describes six factors to be taken into consideration. The first involves a diversion of sales factor. The district court demanded or relied upon a heightened evidentiary standard. He insisted on looking for direct evidence for determining whether sales were diverted. He then also employed an incorrect evidentiary standard when he viewed the admissions of the party opponent, Becton Dickinson here, which he termed as being attenuated and speculative even though they were party admissions. On the second factor, the one is of palming off. The court not only looked to the palming off factor, but he gave it special weight. He gave it special weight in a false advertising case when that is a factor that exists primarily almost exclusively in trademark cases. So stepping back for a second, looking at this court's cases, we learn what are the single most important considerations in determining whether to award profits. From this court's cases in Quick Tech, we know that intent is a very important factor. It's not required, but it is very important. Intent is established in this case. It was established by the Fifth Circuit in the prior opinion. The second thing flows from the Logan decision, Logan v. Burgers. What we learned from that case is that there either must be a harm to the plaintiff or the defendant must have benefited. If neither exists, then you probably cannot get profits. But either one of those will support profits, either a benefit or a harm to the plaintiff. These considerations over time, particularly in the trademark area, this court has created the six-factor test, which is the six-factor test that's enunciated most clearly in Pebble Beach. I want to start in on the problem with the decision on the diversion of sales. Judge Mazant erroneously concluded that there was no evidence of diversion of sales. This is what he said. The record does not contain any direct evidence that RTI lost sales to BD from these retailers because of BD's waste space and needle sharpness claims. No direct evidence, he said. That's conclusion of law number 10. There's no requirement for direct evidence. That is something that is well established. It is in this court's pattern jury charge instructions. It was in our jury charge instructions. Direct evidence is not required. Circumstantial evidence works. But beyond that, what the court did was it looked at the many admissions that came from BD's managers, primarily marketing managers who were engaged in making decisions and how to sell their syringe products, and he called all of those admissions against interest speculative and attenuated. I have a couple examples that I'd like to show to the court. The first one is under tab two of your handout. The court said BD's internal document does not say anything about why Wal-Mart supposedly selected BD. That's his statement. This is what BD's internal document says. I do know that we were up against RTI at Wal-Mart, and it names the number of units, and we won with Integra due to our proof of medical savings. And then another example that I provided to the court is under tab three. The court said there's no evidence that Maxim ever saw the waste space comparison. But this is what BD's internal document says. It says, here is the original presentation used with Maxim. And then we have that original presentation at tab three, and you can see it was what they provided to Maxim, which showed these false waste space comparisons between BD's syringe and RTI syringe. And I provided these to you for a reason, because what these charts show, particularly the one under three and one under four, is that the comparison was being made between our retractable syringe, their retractable syringe, and BD's conventional syringe. BD's conventional syringe was also used for most of their safety syringe products other than their retractable syringe. They would take the conventional syringe, and then they would screw a safety type of top to it with which you could manipulate and cover the needle. And then under four, and I wanted the court to see this, one of the instructions that was sent out from a BD marketing manager is that, following up on a presentation, if this particular client did not buy BD Integra, he says, please make sure it is one of our other safety skin injection products that they buy. So they were using these false waste space comparisons, primarily to knock our product out of contention. They got rid of our product, and then they would roll forward with all of the rest of their products, all their safety syringes, and all their conventional syringes. The reason that diversion of sales, I just want to talk theoretically about that for a minute. Diversion of sales is a combination of the two important factors that we look at via the Logan case. It's a combination of a harm to the plaintiff and a benefit to the defendant. They don't have to be directly linked like that, but diversion of sales brings those two together in a particular way where you're considering both at the same time. Texas Pig Stance 2, and I just want to mention this briefly, is an important case. It's the second Texas Pig Stance decision that came back and explained the first Pig Stance decision. It was on motion for rehearing. And what this court made very clear in its second Pig Stance decision was that the reason the profits were not awarded was based, and I'm quoting the court, solely on the lack of evidence showing that any of defendant's profits were the result of the infringement of the mark. That's what this court was looking for, was the benefit to the defendant, and it didn't find it there. Here, established in the first appeal, this court said, we find no clear error in the district court's conclusion that at least some portion of BD's profits were attributable to the false advertising. That's established. Let me go quickly, then, into Palming Off. This is the other sweeping problem with district court's decision. Not only did he rely on Palming Off, but he gave it special weight. What is Palming Off? Palming Off is when you have knockoff goods. I sell my fake Rolex watches. It's using somebody else's brand to market your goods as if it was that brand. We told the court repeatedly that this was not a proper factor in a pure false advertising case. We told that to Judge Davis. We told that to Judge Massant. Not only did he weigh it, he gave it special weight. In a pure false advertising case, it would be very rare that it would involve some form of Palming Off. The problem is this. The way that the court has used Palming Off, he's created distinction within the Lanham Act that doesn't exist within the words of the statute. He's created a situation where it's much easier to get profits in a trademark case than it is in a false advertising case because everybody in a pure false advertising case starts off in the ditch. They're going to have one factor weigh against them, and it's a special weight factor. It's going to be hard to overcome that. If you look at the statute, there's nothing that creates that kind of differentiation between trademark and false advertising. They're supposed to be on an equal footing with one another, but now we've created distinctions there. What we have is people like us in false advertising cases. It will be very difficult to get profits disgorged through the statute. This brings us back to why is it that we have the Lanham Act, and it exists to remove economic incentive from violations of the statute. What we have in this case is a decade-long campaign of deception of the medical supply purchasers to believe that our product wasted medication, that it underdosed patients, that our needles were more painful than Becton Dickinson's. Becton Dickinson used that to sell more syringes and to sell them at higher prices. If no profits are awarded here, then Becton Dickinson gets to keep all of that windfall. It's very clear, the Supreme Court has made it clear in Mishawaka, if there's a choice to be made between a wrongful acting defendant to keep its profits or for that defendant to have to give them up, he has to give them up. Then the other problem that exists here is the manner in which Becton Dickinson did this was to kind of hold down on the incoming new technology of retractable syringes, which caused that market to not be able to grow over the years. Under tab 7, I've shown you what their estimates were. They expected it to occupy 19% of the market. Where was it at the time of trial? 5%. So what do you do with the warning that the first panel in this case gave, a warning against speculative and attenuated evidence of diversion? We have to accept that, don't we? Yes, you do, but then you go back and you say, fine, is the evidence speculative and attenuated? And what was before this court was not speculative or attenuated evidence. And I might point out also what Mishawaka made very clear is that when you are looking at attribution, at the profits that are attributable to the wrongful acts, it is the defendant who has to show that the profits were not attributable. That is very well established in the law. And so there was no speculative or attenuated evidence before. I mean, it was BD admissions. I think the court, for the first time, we have asked that this case, that you, we ask that you render judgment that we are entitled to profits, and then you can remand for a determination of those profits. Thank you very much. All right, thank you. Ms. Thames, you've saved time for rebuttal. Mr. Atkins? May it please the court, Robert Atkins, counsel for the Aptly-Becton-Dickinson BD. Let me start with the two purported legal errors, diversion, palming off. On diversion... Well, why don't you start with the direct evidence standard. Ms. Thames referred to the pattern jury charge and suggested that Judge Mouzant diverged from that. He did not apply an improper standard or direct evidence standard. What he did, he cited, along with myriad other evidence, the fact that counsel for RTI had admitted, standing here actually two years ago, that they had no direct evidence of diversion. What do the pattern jury charges say? Well, there is no pattern jury charge for disgorgement or the Pebble Beach factors since this is an issue that's delegated to the court, not a jury. So the standard for assessing evidence of the diversion factor is the one that Judge Jones articulated on the remand decision. Okay, so Ms. Thames says, and she, again, referring to the pattern jury charges, and I understand that's a jury charge, that she says that it specifically says circumstantial evidence is enough. Do we ignore that? No, we don't ignore those words, and we don't ignore any of the evidence. If you look at the totality of the evidence, direct, circumstantial, what both this court found when it remanded and what Judge Mouzant found after doing a detailed, meticulous, thorough review of the entire record, only snippets of which have been before you, he found that there was no evidence of diverted sales from RTI to BD that wasn't speculative and attenuated. They admitted there was nothing direct. The rest of the evidence was comprised, as Judge Jones had described it, of boastful BD sales rep emails and sales pitches, which were not substantiated by any testimony. RTI did not call a single witness from BD, not the authors of the documents, from RTI, and we thought most powerfully, as did the prior panel, not a single customer testified, including from the examples you were shown, came to court and testified that they were confused or misled or bought the RTI – sorry, bought the BD product because of the BD ads. Now, the examples that you were shown – first of all, let me note what is self-evident. These sort of excerpts and snippets are just a tiny piece of a huge record that was reviewed by Judge Mouzant. We clashed over this, of course, at trial on remand in the district court, and this court, as you know better than I do, needs to come to the firm and definite – have a firm, definite conviction that Judge Mouzant reviewed it incorrectly. So you will see from just the examples RTI gave you today how he was not incorrect. And so let me just give you – let me start with just the first one behind tab two, Walmart. They say that Judge Mouzant found that an internal document did not say anything about why Walmart bought, and then they go to quote another document, which says that BD won because of med savings. Number one, that is a misrepresentation of what Judge Mouzant did and the record. If you look at paragraph 57 and 58 of Judge Mouzant's findings of fact, number one, he didn't overlook the quote that they provided to you. He quoted it. The document that he cites for the proposition that, quote, BD's internal document does not say anything about why Walmart supposedly selected BD, that's a different document. So the presentation today is misleading. But more than that, what Judge Mouzant did, as was his charge following remand, and what wasn't shared with you by my adversary, is that he reviewed the totality of the evidence, not just the BD sales rep saying, hey, I won Walmart. So take a look at – maybe you'll take a look at paragraph 57 of Judge Mouzant's findings of fact. He quotes the document they like. He quotes the other document from the sales rep that says I won Walmart but doesn't say why. And then he goes on to make three separate additional findings on the record, which is uncontested. One, RTI drafted a press release announcing that they, RTI, not BD, had been selected as the exclusive supplier of Walmart. Nothing was diverted from RTI. RTI won an exclusive contract. Two, this is Judge Mouzant, sales data, data, evidence, RTI's electronic sales data confirms that RTI sold 1.4 million units to Walmart, not BD. Three, Judge Mouzant again, Mr. Shaw, the CEO and president of RTI, confirmed on the stand – that was a witness – that RTI won an exclusive contract with Walmart. So that is – it's a case study in what happens at trials, why the appellate court pays great deference to trustworthy fact-finders like Judge Mouzant, who review the totality of the record, which was his charge, which he formed – performed, I would submit, to a T. There's one other finding that Judge Mouzant made about Walmart that's so illustrative of everything that's happening here. Not only did RTI win the business, he found, based on actual sales data, that Walmart never bought from BD again. That's Walmart. I won't belabor it, but let me also do one of the other examples, the VA hospital in Houston. This is significant because they rely on it. It's also significant because this was the one example the original trial judge, Judge Davis, cited when he originally found – and we appealed and it was reversed – that RTI had established that there were some diverted sales. It was that finding that this court found needed to be reviewed again, applying the not-speculative and attenuated standard. So this is VA Houston. They have given you in their little spiral bound a snippet from Judge Mouzant's finding to fact in paragraph 56. It starts with, there is no evidence before the court indicating that VA Houston ever saw the Savings Model. Ellipses. Two things. He is correct that there is no evidence that the VA ever saw the Savings Model. They cite a document with someone from B talking about the savings but not saying, I gave it to VA. Nothing from the VA testifying, we got it. They didn't even subpoena the VA to find out if it was in their files. So there's no evidence it was seen by the VA. More importantly, seen is not evidence of diverted sales. In every Lanham Act violation case, trademark or false advertising, the consumers see the infringing mark. They see the false advertising. The question is, did they rely on it? Did they believe it? Did they make purchasing decisions based on it? And that is what was at issue in the C-TRAX case in which this court first articulated that speculative and attenuated evidence of diversion will not suffice. Why? Because in that case, there actually was eyewitness testimony that customers saw the infringing mark. And this court found on appeal, affirming the denial of disgorgement for lack of diversion, said whether or not the customer then relied on it, made purchasing decisions based on it, was influenced by it, that's speculation and that's attenuated. That's this case at its very best. Returning to the VA Houston, there's no evidence the VA Houston even saw it. But more than that, going back to the ellipses in the quote that RTI's counsel provided to you, here's what's been ellipsed out. Judge Mazant's findings of fact that are uncontested. He goes on to find, with respect to VA Houston, that there was no evidence that the VA, quote, relied on the model in making purchasing decisions or actually purchased the BD product. That's paragraph 56. He then goes on. And Judge Mazant finds, quote, referring, he quotes, there is sales data, again evidence, that showed that the VA Houston actually bought more from RTI. Not nothing, not less, not diverted. Sales data showed that VA Houston actually bought more from RTI when? After it allegedly was shown or saw this false advertising. So Judge Mazant found it's not even challenged as erroneous. It's not imaginable that it could be clearly erroneous that there was no evidence that that prime example presented by RTI resulted in any diverted sales. In fact, it resulted in increased sales. Did they buy anything from BD? No, they did not. So next example. Maxo. This is behind paragraph three. I'll tell you what, this is interesting. It's an example of why this court is not in a position to effectively engage in a re-argument of the evidence. But it's also illustrative of what happened in the trial court and why Judge Mazant was so unpersuaded by the evidence. Whatever the standard, direct, circumstantial, inferential might be. So they say, again, they quote the judges saying there's no evidence that Maxim ever saw the waste space comparison. And there is no evidence that it influenced Maxim. And they say, but wait a minute. This is a BD email, a BD admission. What is this BD document actually? They snip out the words, quote, worked for our Maxim story. That's supposed to be clearly erroneous, reversible error. They're entitled to rendering judgment from a court of appeals awarding them profits. What's the whole sentence say? I'm reading from this is plaintiff's executive 641. It's cited behind there, tab three. This is what the whole thing says. Referring to this all-important supposedly waste-based claim. The author, but wait, the author wasn't deposed. The receiver wasn't deposed. The customer wasn't deposed. No one was called to actually explain this show diversion because it doesn't. Here's the sentence. I think the medication savings, that's the waste space, despite the great story, has not been as widely valued or embraced in our customer segment. And the author cites something called synovate report findings. Forgive me for delving so far into the record, but I've been called to this. That's plaintiff's exhibit 636. What's that? That's a study. That's an actual study of the efficacy of this waste-based claim. It's in the record. What did it conclude? Quote, Integra's main differentiating factors. Medication savings are not driving intent to purchase. That's the evidence. There were no diverted sales. There's no evidence of diverted sales. Not a single witness from a single hospital or clinic or nursing home took the stand to say when I saw the BD ad, I threw RTI out. I bought RTI. Not a single witness, not a single piece of evidence that wasn't pure speculation or, in these examples, just outright wrong and incorrect. Now, it's not as if this isn't a gotcha game, like we had a trial, they showed up, they didn't bring the goods. The evidence also demonstrates, and Judge Bizantso found, why there was no diversion of sales from these ads. One, I just read you the study that said it was ineffective. The other evidence is that, and this is from the testimony of RTI's president, he testified that the BD Integra, the product being advertised, hardly sold at all because, in his view, it was a lemon. Now, that's just one man's word. He also certified it, subject to Sarbanes-Oxley, in RTI's 10-K, filed in March 2008, six years after Integra was on the market, six years after this waste-based claim had been introduced to the marketplace. You know what they told the SEC and the investing public? This is also in the record. The Integra has had no noticeable impact on our sales. There is no evidence that this ad worked. Now, why did BD's products sell? For all kinds of reasons that the record also establishes. Price, quality, safety, medical care, clinical features, clinical benefits. Unlike even the trademark infringement cases where this court has affirmed the denial of discouragement, there is a rich and deep record of evidence why BD's products sold, having nothing to do with these ineffective advertising claims, which they found no one who would come to court and testify had any impact. So who had the burden on this? Ms. Timm says that you have the burden. Is that right? Two questions. Who has the burden on diversion? That is one of the six Pebble Beach factors. The plaintiff. There's no dispute. What she's referring to is a different legal question, which is attribution. That is, before—and this is what the court held in Logan. Before you even weigh the factors as to whether it's equitable to distribute profits, Logan says, first ask, were there any profits that the defendant earned that could be attributed to the ads in the first place? Did they generate sales and profits for the defendant that we can then consider whether or not to distribute or discord to the plaintiff? That attribution test, that is the defendant's burden. Now, in this case, it's a non-question on appeal because both this panel or the previous panel, I should say, and Judge Mazant found that from BD there was some evidence that $560,000 of profit could be attributable to the two false claims. RTI put in no evidence. They didn't challenge BD's evidence. So Judge Mazant on remand took that as a given, and what Judge Mazant really decided was do the equitable factors favor discouraging some portion of this attributable $560,000 in BD profits? But the burden on diversion and the other factors, the adequacy of remedies, et cetera, that is on the plaintiff. And I would submit they didn't meet their burden. I'd also submit that we demonstrated to a fairly well on our own that they were unable to establish the diversion factor. So just to sum up on diversion for a second, the district court did not apply an inappropriate standard. It applied the standard that it was directed to apply by this court following its precedent in C-TRAX. Pominoff. Judge Mazant, I will defer to you all to read the decision itself. He didn't give special weight to Pominoff. He didn't make a sweeping error, as I heard before. There's one paragraph in his decision about Pominoff. It's three sentences. Why is there a paragraph about Pominoff? There's a paragraph about Pominoff because RTI argued that the court should consider it, should give it weight. Let me read to you from RTI's opening brief on remand to Judge Mazant. This is what they said. This is page 19 of their brief, which is at page 3381 of the record on appeal. Pominoff, a type of trademark infringement, was not an issue here. However, its harms are like those in this false advertising case, and so the topic merits discussion. And they went on to argue what Judge Mazant described as a novel and alternative theory about why Pominoff should favor discouragement. He gave them their time of day. He reviewed the record, and he concluded, quote – this is at 19 of his conclusions of law – nothing in the record indicates that this factor should favor discouragement. He didn't conclude that they'd lose because they couldn't prove Pominoff. He reviewed the factor because they asked him to. He said it just doesn't go in the discouragement column. And why is that? Well, he clearly was correct because their alternative theory of false advertising as Pominoff was that there was some harm to RTI's reputation and goodwill. That was the theory, which he found there was no evidence to support. Was he clearly erroneous? Clearly not. Best case – best example is RTI's own consumer perception expert, a marketing authority, did a survey, and this is what she found. Record on appeal 9732. Customers familiar with retractable syringes, quote, had a very favorable impression of RTI. And during the life of these advertisements, RTI's sales went up, RTI's market share went up, and RTI came to dominate the retractable segment. And when they came to this court and Judge Jones and argued in the first appeal that BD had tainted and blemished and tarnished RTI, Judge Jones concluded BD did a mightily poor job of that. In other words, there was no harm, there were no diverted sales, and therefore it was clearly within the judge's wide discretion to decline to award profits to RTI. All right. Thank you, Mr. Adkins. Thank you very much, Your Honors. Ms. Timms, you've saved time for a vote. Okay. May it please the court again. And let me start with diversion. First of all, two general across-the-board statements. There is no requirement under diversion that they take 100% of our sales. They just have to take sales. They may have to be diverted to BD, and it doesn't have to be wiping us out completely and across the board. Secondly, there's a situation like this. As I've shown under tab number seven of our handout, this is what the market was supposed to do. It was supposed to go up at a pretty nice angle. This is what the market did. It stayed flat. It may have even gone down a little bit from where they had it. Why does that exist? So that is a form of diversion of sales. Let me drill down to the particulars, though, on some of these because they're interesting. One is Walmart. We've talked a lot about Walmart. If you look at the statements that they made about Walmart, when they took the $2 million in syringe sales from us on Walmart, that was 2005. It was in 2006 that we were able to sell 1.4 million syringes to Walmart for flu shots. BD says, and the court found, that BD did not sell to Walmart after 2007. But there are places in the record, and I'll give you sites. One of them is at ROA 36466, and the other one is at Plaintiff's Exhibit 568-79-80. Both of those exhibits are from Becton Dickinson, and what they are is a discussion of the fact that Walmart had subcontracted to North Star. And North Star was the one who's providing all of the immunizations for Walmart. Becton Dickinson has not tried to tell you that they didn't sell to North Star. What we were calling Walmart was actually North Star. That's Walmart. Secondly, let's talk about VA Houston for just a second. This is the one where they say they went in with all of these displays to VA Houston, documented at the time that they had sales to VA Houston, but that, in fact, I think I heard him say that they had no sales to VA Houston in response to Judge Graves' question and that our sales went up. This is their exhibit, and it is Record on Appeal 36474. And I don't know if you can see it very well, but these are our sales. This is when they went in with their cost calculator. The red column is our sales. The blue column is theirs. Yes, our sales went up. Their sales went up in the next year, and they did sell all of these blue things. That's all Becton Dickinson across the page going through 2009. Yes, they had sales. To the VA. To the VA Houston. And then if you look at the difference, even though our sales went up, they went up at a much smaller pace than the Becton Dickinson sales went up. This is about a 35% increase in their syringes. It's about a 65% increase on Becton Dickinson syringes. The fact of the matter is VA Houston just bought a lot more syringes in 2006 than it did in 2005. On Maxim, they have said that they looked at the piece of paper where he said that, you know, overall the story wasn't working as well as they thought. It worked at Maxim, but, you know, it wasn't as good a story as they wanted it to be. What they're saying is, and this was I believe it was after they had been sued by us on Lanham Act. What they were saying was we wish we could do Maxim more, and we wish we had more opportunities to sell just like we did to Maxim through the use of these charts. And finally, let me say that we have established in the first appeal intent. We have established that they benefited, and from those things we should get a disgorgement of profits. And unlike what Mr. Adkins just said, this court did not establish $560,000 as a ceiling for those profits. That was just simply what their own documents said could be attributable. I thank the court for its time, and we ask for reversal and rendition on this issue. Thank you.